IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs November 4, 2020

**CODY D. MARKS v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Giles County**
**No. CR-14797       J. Russell Parkes, Judge**

_____

**No. M2019-02249-CCA-R3-PC**

_____

A Giles County jury convicted the Petitioner, Cody D. Marks, of the sale of more than 0.5 grams of cocaine within 1,000 feet of a public park, and the trial court sentenced him as a Range II offender to fifteen years of incarceration, twelve years of which was to be served at 100%. This court affirmed his convictions and sentence on appeal. *State v. Cody D. Marks*, No. M2018-00020-CCA-R-CD, 2018 WL 6992553, at *1 (Tenn. Crim. App., at Nashville, Nov. 13, 2018), *perm. app. denied* (Tenn. Mar. 28, 2019). The Petitioner filed a petition for post-conviction relief, alleging that he had received the ineffective assistance of counsel. After a hearing, the post-conviction court denied the petition. After review, we affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and J. ROSS DYER , JJ., joined.

Manuel B. Russ, Nashville, Tennessee, for the appellant, Cody D. Marks.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Senior Assistant Attorney General; Brent A. Cooper, District Attorney General; and Rebecca S. Parsons, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I. Facts**

This case arises from a series of controlled drug buys made by a criminal informant working with the Pulaski Police Department. At the conclusion of these drug buys, the Giles County grand jury indicted the Petitioner for sale of more than 0.5 grams

of cocaine within 1,000 feet of a public park.[1]  In our opinion on direct appeal, we summarized the facts presented at trial as follows:

In June of 2015, Joshua Higdon was working as a criminal informant for the Pulaski Police Department. . . .

On June 9, 2015, Mr. Higdon contacted [the Petitioner] about purchasing two grams of crack cocaine, which was usually priced at $100 per gram.  Mr. Higdon testified that he initially asked for one gram but then asked for two because "the officers wanted more."  Mr. Higdon met with Investigators Shirey and Bass at an undeveloped subdivision in a secluded area about five or six miles outside of town.  Investigator Shirey searched Mr. Higdon and his truck while Investigator Bass provided Mr. Higdon with $200 cash and audio recording equipment.  Investigator Shirey testified that he gave Mr. Higdon a thorough pat down, checked his pockets, and then searched anywhere in the cab of the truck where drugs or weapons could be hidden, including inside the glove box. . . .

Mr. Higdon returned to his house and waited for [the Petitioner] outside by his truck so that the officers could see him.  Investigators Shirey and Bass drove up and down the street in an unmarked police car in order to monitor [Mr. Higdon]; however, they could not maintain constant surveillance because of the potential of being recognized as police.  Investigator Shirey testified that every time they passed Mr. Higdon's house, he was outside and appeared to be working on his truck.  Mr. Higdon testified that when [the Petitioner] arrived, they went inside the house briefly because [the Petitioner] did not want to be outside to make the exchange.  According to Mr. Higdon, [the Petitioner] "didn't have all of the - - what I wanted."  Mr. Higdon testified that [the Petitioner] offered to obtain the rest of the drugs and meet Mr. Higdon at Bad Habits, a convenience store "right around the corner," to complete the transaction.  In the audio recording, [the Petitioner] can be heard saying that he will go "right down the street and get the other hundred."  Mr. Higdon testified, "So I kept half the money, kept half the substance."  Mr. Higdon then contacted Investigator Shirey to ask whether he should turn over what he had and the extra buy money or whether he should meet [the Petitioner] again to complete the transaction.  Mr. Higdon did not meet with the

---

[1] The Petitioner was originally indicted for sale of more than 0.5 grams of cocaine within 1,000 feet of a middle school, but the State later amended the indictment to be within 1,000 feet of a public park.

officers prior to heading to Bad Habits. Investigator Shirey admitted that he was not sure how much, if any, of the drugs Mr. Higdon received while inside his house.

After a few minutes, Mr. Higdon drove to Bad Habits, which he estimated was about three blocks from his house. Mr. Higdon testified that it was [the Petitioner's] idea to meet at Bad Habits. Investigators Shirey and Bass drove to that area to continue their surveillance while Investigator Ryan Southerland parked at a gas station across the street to record the transaction with a video camera. The video recording shows [the Petitioner] walking down the road toward the store and Mr. Higdon sitting in his truck in the parking lot of Bad Habits. Investigator Bass testified that Investigator Southerland would have informed him if anyone else had approached Mr. Higdon's truck prior to the start of the recording. The video shows [the Petitioner] getting into the passenger side of Mr. Higdon's truck and engaging in a short conversation. Mr. Higdon testified that [the Petitioner] exchanged the remainder of the drugs while inside his truck. Mr. Higdon agreed that he went inside the store at one point, which is not depicted on the video recording, but he denied purchasing drugs from anyone while inside.

Mr. Higdon testified that when he pulled out of the parking lot, he thought he saw [the Petitioner's] girlfriend following him in a silver Impala. In the video, a silver car can be seen leaving the parking lot after Mr. Higdon's truck. Because he believed that he was being followed, Mr. Higdon first drove home rather than directly to the designated meeting place. After waiting for a few minutes, Mr. Higdon believed he was still being followed, "[s]o [he] rerouted and [he] got lost." Mr. Higdon explained that at the time, he had lived in Pulaski for only a few months and was not familiar with the area. Investigator Shirey testified that even though Mr. Higdon had been working as an informant for a while and had participated in five or more drug buys for the police department, this was the first time they had used this particular meeting location. Investigator Shirey agreed that he lost sight of Mr. Higdon for what "seemed like forever" but was actually about fifteen or twenty minutes. Mr. Higdon called Investigator Shirey while he was driving around, relaying various landmarks and directions, and Investigators Shirey and Bass drove around searching for Mr. Higdon. Mr. Higdon agreed that one of the areas he drove through was the Meadowbrook neighborhood, which he characterized as "dope central," but he denied meeting anyone or having drugs stashed somewhere on the side of the road.

When Mr. Higdon finally met up with the officers, he gave them "all the substance" he had purchased from [the Petitioner], which field tested positive for cocaine. The officers searched Mr. Higdon and his truck again. Special Agent Brett Trotter, a forensic scientist with the Tennessee Bureau of Investigation, described the substance as a compressed powder rather than a solid rock, like "sugar [that] had gotten slightly wet." Agent Trotter determined the substance to be 1.25 grams of cocaine base. Using a measuring wheel, Investigator Shirey measured the distance between the location of the drug sale in the parking lot of Bad Habits and a sign designating North End Park across the street as 164 feet. The distance from Mr. Higdon's house to either the park or a nearby daycare center was not measured. . . .

*Marks*, 2018 WL 6992553, at *1-3. This court affirmed the Petitioner's conviction. *Id.* at *1.

The Petitioner filed a *pro se* petition for post-conviction relief that appointed counsel later amended. In it, as relevant to this appeal, he contended that his trial counsel ("Counsel") was ineffective for allowing the State to hold a hearing on its motion to amend the indictment outside of the Petitioner's presence. He next contended that Counsel was ineffective because he did not effectively impeach Investigator Bass about his allegedly contradictory testimony regarding the calculation of the school zone/public park zone enhancement of his sentence.

The post-conviction court held a hearing on the petition, during which the parties presented the following evidence: Counsel testified that the grand jury had originally indicted the Petitioner for the sale of 0.5 grams of cocaine within 1,000 feet of a school-zone, namely Bridgeforth Middle School. The State then filed a motion to amend the indictment on January 31, 2017, approximately two weeks before trial, to change the drug-free school zone enhancement, a Class A felony, to a drug-free zone enhancement, a Class B felony. Counsel contacted the Petitioner on February 2, 2017, to inform him of the amendment to the indictment. Because of the scheduling of the parties, the trial court held a telephonic hearing on the motion on February 3, 2017, and the Petitioner was not present for the telephonic hearing. The case went to trial on February 6, 2017. Counsel agreed that he was aware of Tennessee Rule of Criminal Procedure 43, which required a defendant to be present at all essential parts of his trial. Counsel said that his research indicated that it was within the trial court's discretion to allow the amendment.

Counsel explained that the facts of the case did not change, so he did not ask for a continuance. The State had alleged, and discovery showed, that there had been two

transactions, one at Mr. Higdon's house and the other at Bad Habits. The State removed the allegation that the transaction occurred within a drug-free school zone and alleged instead that it occurred in a drug-free zone. He said that this did not change his defense of the case. He still, however, objected on the record before the trial.

Counsel said that, during the trial, the Petitioner expressed his desire to question Investigator Bass about the fact that he had testified to the grand jury that this case occurred within 1,000 feet of a school zone, but, based upon the amendment, admitted that such was not the case. Counsel said he questioned the investigator under oath about this fact.

During cross-examination, Counsel testified that the State had a strong case against the Petitioner. The discovery was typical for a drug case, and it included an audio recording from the entire transaction and video recorded from a location across the street from Bad Habits. The pivotal part of their strategy was to impeach Mr. Higdon by laying out his prior convictions and lengthy criminal history. This strategy did not change when the State amended the indictment to be in a drug-free zone rather than a drug free school zone.

Counsel testified that he objected at trial to the State's amendment and to the telephonic hearing because the Petitioner wanted him to object. He, however, opined that the amendment actually benefitted the Petitioner because it lowered the felony of his charged offense, which reduced the potential punishment as a Range II offender from a twenty-five to forty year sentencing range to an eight to twenty year sentencing range. He was also aware that the State could have dismissed the case and reindicted the Petitioner for the amended offense.

The Petitioner testified that Investigator Bass committed perjury because he swore before the grand jury that the offense occurred at Mr. Higdon's house, which the investigator said was within a drug-free school zone, but then, at trial, he said that the offense occurred at Bad Habits, which was in a drug-free zone. The Petitioner said that he was unaware that the indictment had been amended until the day of trial when the judge informed him and that Counsel never informed him previously that the State had filed a motion to amend the indictment.

Counsel was recalled, and he testified that he was certain that he informed the Petitioner about the State's motion to amend the indictment and that the two discussed it before trial.

Based upon this evidence, the post-conviction court denied the Petitioner's petition for post-conviction relief. It is from this judgment that the Petitioner now appeals.

## II. Analysis

On appeal, the Petitioner alleges Counsel provided ineffective assistance because he failed to inform the Petitioner of the telephonic hearing on the motion to amend the indictment and because he did not adequately impeach Investigator Bass. The State counters that the post-conviction court did not err when it denied the Petitioner's petition.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2018). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2018). The post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates against it. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). Upon review, this court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999); *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997). A post-conviction court's conclusions of law, however, are subject to a purely de novo review by this court, with no presumption of correctness. *Id.* at 457.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Strickland*, 466 U.S. at 688).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland,* 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. *Strickland*, 466 U.S. at 690; *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "The fact that a particular strategy or tactic failed or hurt the defense does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation." *House*, 44 S.W.3d at 515 (quoting *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)).

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

## 1. Telephonic Hearing

In the case under submission, the Petitioner contends that he was released from jail on bond at the time of the hearing on the motion to amend his indictment, so he could have attended if Counsel had informed him of the hearing. He asserts that the post-conviction court erred when it accredited Counsel's testimony regarding the hearing. Finally, he asserts that the State's amendment to the indictment materially altered the indictment. The State counters that, even had Counsel failed to inform the Petitioner about the hearing, the Petitioner cannot prove that Counsel was deficient or that he was prejudiced. We agree with the State.

The post-conviction court found first that the amendment of the indictment occurred before the jury was empaneled. It further found:

> [A]ny question as to the amendment of the indictment certainly came as no surprise to the [Petitioner], worked specifically to the [Petitioner's] advantage, and presented a question of law to which the [Petitioner's] presence was not required under Rule 43 of the Tennessee Rules of Criminal [P]rocedure.

The post-conviction court resolved conflicts in testimony against the Petitioner.

Rule 7(b) of the Tennessee Rules of Criminal Procedures states, in part, that "[i]f no additional or different offense is thereby charged and no substantial rights of the defendant are thereby prejudiced, the court may permit an amendment [to the indictment] without the defendant's consent before jeopardy attaches." The trial court has the discretion to grant or deny a motion to amend the indictment under such circumstances, and this Court will alter the trial court's decision only if that discretion is abused. *State v. Kirkland*, 696 S.W.2d 544, 545 (Tenn. Crim. App. 1985).

In *State v. Moss*, 662 S.W.2d 590 (Tenn. 1984), the Supreme Court declared that Tennessee would no longer follow the strict common law rule but would follow the "substantial variance rule" followed by most other jurisdictions and expressed in *United States v. Schoenhut*, 576 F.2d 1010 (3rd Cir. 1978). Under this rule, as set out in *Moss*:

> Unless substantial rights of the defendant are affected by a variance, he has suffered no harm, and a variance does not prejudice the defendant's substantial right (1) if the indictment sufficiently informs the defendant of the charges against him so that he may prepare his defense and not be misled or surprised at trial, and (2) if the variance is not such that it will present a danger that the defendant may be prosecuted a second time for the same offense; all other variances must be considered to be harmless error.

662 S.W.2d at 592.

Tennessee Rule of Criminal Procedure 43 provides that the presence of a defendant is not required at "a conference or argument on a question of law." Tenn. R. Crim. P. 43 (d)(3). The question of whether an indictment was properly amended is "a question of law; hence, our standard of review is *de novo* without a presumption of correctness given to the trial court's conclusions of law." *State v. Jackson*, 60 S.W.3d 738, 742 (Tenn. 2001).

We agree with the post-conviction court that the amendment to the indictment occurred before the trial began. Whether the State had the right to amend the indictment is a question of law made by the trial court during a telephonic hearing. The Petitioner's presence was not, therefore, required. The indictment variance did not prejudice the Petitioner, and, in fact, may have benefitted him in that it charged him with an offense that carried a shorter sentence. We conclude that Counsel was not ineffective, even if Counsel did not inform the Petitioner of the hearing. We further conclude that the Petitioner did not prove how he was prejudiced because he was not present during the telephonic hearing. The Petitioner is not entitled to relief.

### 2. Cross-Examination of Investigator Bass

The Petitioner next contends that Counsel was ineffective because Investigator Bass committed perjury when he informed the grand jury about the distance of the school in the first sale versus the distance of the public park in the second sale. He further contends that Counsel should have attacked the overall credibility of the investigation. The State counters that Counsel's performance was neither deficient nor prejudicial. We agree.

The post-conviction court found that the transcript shows that Counsel had, in fact, asked Investigator Bass about the original presentation of the case to the grand jury as occurring within 1,000 feet of a school zone. It further found that Counsel cross-examined him about how he could be mistaken about the distance between where the alleged crime was committed and the school zone. The post-conviction court found that Counsel's performance was not deficient in any way.

The cross-examination of a witness is a strategic and tactical decision, not to be measured in hindsight. *See State v. Kerley*, 820 S.W.2d 753, 756 (Tenn. Crim. App. 1991). The Petitioner has not shown that any increased cross-examination of Investigator Bass would have likely affected the verdict. We conclude that he has not proven that Counsel was ineffective or that he was prejudiced.

### III. Conclusion

Based on the foregoing authorities and reasoning, we conclude that the post-conviction court did not err when it denied the Petitioner's petition for post-conviction relief.

_____
ROBERT W. WEDEMEYER, JUDGE